IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIXION, INC., | No. C 03-02909 SI |
| Plaintiff/Counterdefendant, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '313 PATENT AND PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S TRADE SECRET CLAIM** |
| v. | |
| PLACEWARE INC., | |
| Defendant/Counterclaimant. | |

On November 4, 2004, the Court heard oral argument on defendant's motion for summary judgment of non-infringement of the '313 patent and defendant's motion for summary judgment on plaintiff's trade secrets claim.[1] Having carefully considered the arguments of counsel and the papers submitted, the Court hereby orders as set below.

**BACKGROUND**

On June 23, 2003, plaintiff Pixion, Inc. sued defendant PlaceWare, Inc. for misappropriation of Pixion's trade secrets, infringement of Pixion's patent rights in the '313 patent, and infringement of Pixion's trademark. Defendant counterclaimed for a declaratory judgment that the '313 patent is not valid, not enforceable and/or not infringed by PlaceWare, and that Pixion is infringing PlaceWare's U.S. Patent No. 5,951,694 ("the '694 patent").

In April 1997, Pixion and PlaceWare entered into a Non-Disclosure Agreement, under which Pixion

---

[1] Plaintiff also filed a motion for partial summary judgment of non-infringement of the Placeware/Microsoft '694 patent, which was heard at the same time. However, the parties have recently informed the Court that the counterclaims on the '694 patent are no longer being pursued. Accordingly, that motion is deemed withdrawn [Docket # 160.].

shared information about its web conferencing technology. In August 1997, the parties entered into a License & Distribution (L&D) Agreement, under which PlaceWare licensed Pixion's PictureTalk technology for potential bundling with PlaceWare's product. The agreement terminated in August 1998, but PlaceWare remained under a contractual obligation not to use Pixion's technology without its consent. Pixion contends that David Nichols of PlaceWare used Pixion's technology to build a feature called "LiveDemo." In June 1999, PlaceWare announced a new version of its web conferencing product that included "the breakthrough LiveDemo feature." Pixion promptly objected to the product as involving a misuse of its confidential information. In 2002, PlaceWare retained an independent firm to re-design the LiveDemo functionality using a "clean room" approach.

The '313 patent teaches technology that allows real-time web conferencing with multi-speed capabilities. Using this system, "when a web-conference 'presenter' wants to share a stream of visual images with an audience of 'attendees,' the entire audience can see the images in real-time – even if different attendee computers run at different speeds and have network connections of differing bandwidths." Compl. at ¶ 2. The '313 patent teaches a system that is able to compensate for and adapt to differing network and computing speeds and loads, as appropriate. In other words, "if there are both fast and slow computers present, the invention takes this factor into consideration and dynamically compensates to ensure that all computers display as close to the latest information as possible, in as close to real-time as possible, for the given computer attendee." Id.

This Court held a claim construction hearing on the '313 patent on June 24, 2004 and on July 28, 2004, it issued a Claim Construction Order for the '313 patent.

Now before the Court are (1) PlaceWare's motion for summary judgment of non-infringement of the '313 patent and (2) PlaceWare's motion for summary judgment on Pixion's trade secret claim.

## LEGAL STANDARD

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Nike Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 646 (Fed. Cir. 1994) (citations omitted). The moving party bears the initial

1    burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477
2    U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which
3    the non-moving party will have the burden of proof at trial. Id. The moving party need only point out to the
4    Court that there is an absence of evidence to support the non-moving party's case. Id. at 325.

5    The burden then shifts to the non-moving party to "designate 'specific facts showing there is a genuine
6    issue for trial.'" Id. at 324 (quoting Rule 56(e)). To carry this burden, the non-moving party must "do more than
7    simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd.
8    v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be
9    insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."
10   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

11   Summary judgment can be used to determine patent infringement or non-infringement, Avia Group
12   Intern., Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988). The moving party bears
13   the burden of proving infringement or non-infringement by a preponderance of the evidence. Mannesmann
14   Demag Corp. v. Engineered Metal Products, Inc., 793 F.2d 1279, 1282 (Fed Cir. 1986). Summary judgment
15   is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the
16   affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled
17   to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

18   To establish infringement every limitation in a claim must be in the accused product, either exactly or
19   by substantial equivalent. Carroll Touch, Inc., v. Electro Mechanical Systems, 15 F.3d 1573, 1576 (Fed. Cir.
20   1993). A claim is literally infringed if the accused product is exactly the same as each element of the asserted
21   claim. Hi-Life Products, Inc. v. American National Water-Mattress Corp., 842 F.2d 323, 325 (Fed. Cir.
22   1986). Even if a product does not literally infringe it may infringe under the doctrine of equivalents.
23   Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 21 (1997). "A claim element is
24   equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element
25   from the corresponding aspects of the accused device." Sage Prods., Inc. v. Devon Indus. Inc., 126 F.3d
26   1420, 1423 (Fed. Cir. 1997).

## DISCUSSION

**I.  Defendant's Motion for Summary Judgment of Non-infringement of the '313 Patent**

PlaceWare moves for summary judgment of non-infringement of the '313 patent on grounds that the accused product, the LiveDemo feature of the Conference Center product, does not practice any of the three limitations in Claim 1 of the patent. Claim 1 describes a "conferencing system" with an "intelligent server" that receives data from a presenter's computer and sends data to attendees' computers. The server updates screen images by choosing the "optimal format" of the update data that will be sent to each client, based on certain "enumerated parameters": network connections speeds and loads, conference server computing speeds and loads, and client computing speeds and loads. The conference server selects the appropriate output data type to send to each client computer. PlaceWare contends that LiveDemo "is not anywhere near this 'intelligent'" because it simply receives data from a presenter and re-transmits it to the attendees in the same format in which it was received.

Claim 1 of the patent contains the following limitations:

wherein the conference server updates said version of said shared portion of said display with data updates, after taking into consideration the network connections speeds and loads and client computing speeds and loads,

wherein the conference server is capable of delivering the data updates in an output data type selected from base uncompressed data, base compressed data, differenced uncompressed data and differenced compressed data, and

wherein the output data type is selected based on the network connections speeds and loads, conference server computing speeds and loads, and client computing speeds and loads, . . .

In the first "wherein" clause, the Court has construed the term "taking into consideration the network connections speeds and loads and client computing speeds and loads," to mean "monitoring each of the enumerated parameters, and basing a decision thereon." July 28, 2004 Order at 6. The Court observed that this clause "teaches a technology that considers each of the enumerated parameters but does not necessarily base its decision upon each parameter." Id.

In the second "wherein" clause, the Court construed the phrase "capable of delivering the data updates in an output data type selected from uncompressed data, base compressed data, differenced uncompressed data and differenced compressed data," to mean "able to transmit data updates selected from any of the enumerated output data types." Id. at 7.

In the third "wherein" clause, the Court construed the phrase "the output data type is selected based on the network connections speeds and loads, conference server computing speeds and loads, and client computing speeds and loads" to mean "chosen by taking into consideration each of the following: the network connections speeds and loads, conference server computing speeds and loads, and client computing speeds and loads." Id. PlaceWare contends that the uncontroverted evidence about how LiveDemo operates shows that it does not practice any of these three limitations.

### A.    "monitoring each of the enumerated parameters, and basing a decision thereon"

In its July 28, 2004 Claim Construction Order, the Court made clear that the patent requires monitoring of *each* parameter: network speeds, network loads, client computing speeds, and client computing loads. According to PlaceWare, the LiveDemo conference server does not "monitor[] each of the enumerated performance parameters and bas[e] a decision thereon," because it does not monitor client computing speeds or loads. Walker Decl., Ex. D (Nichols Depo.) at 156:14-17. In addition, PlaceWare's expert testified that LiveDemo's source code does not allow the conference server to monitor each of these parameters. Nichols Decl. ¶ 10.

Pixion contends that the LiveDemo feature does this "monitoring" by having "minimum requirements" for network speed and processing speed in order for a computer to operate the PlaceWare product at all. Pl.'s Opp'n at 4:23-26. Pixion argues that "monitoring" does not mean "some sort of active, ongoing and dynamic process," but rather can be accomplished "by establishing minimum requirements at the outset," and through "specific flow control." Id. at 5:13-14; 18-19.

PlaceWare points out that the Klausner Declaration in support of this motion, upon which Pixion relies, does not mention any minimum requirements. See Klausner Decl. ¶¶ 5-8. PlaceWare argues, and the Court agrees, that these minimum requirements for operating the product do not constitute "monitoring" within the meaning of the patent. When a client does not meet the minimum requirements, and therefore is not connected to the conference at all, the "decision" to not send that client any data is not a decision based on consideration of each of the enumerated parameters. It also appears that "flow control" is not the same as monitoring, because flow control just involves the receipt of an "acknowledgment" by a server that a client's computer is

5

ready for more data. This acknowledgment merely regulates the rate at which data is sent, and while its arrival at a server is "based upon the speeds and loads of the network and the speeds and loads of the client computer," it is not the same as monitoring each of the enumerated factors to select the most efficient output data type.

Consequently, the Court finds that there is no literal infringement of this limitation of the claim.

### B. "able to transmit data updates selected from any of the enumerated output data types"

PlaceWare argues that the LiveDemo server never selects an output data type from among the four types enumerated in the patent. Instead, the LiveDemo server performs a relay function, receiving the data in a "compressed" format from the presenter client, and transmitting it, in the exact same format, to the attendee clients. Nichols Decl. ¶¶ 4-9. It does not select a data type at all.

Pixion contends that, under this "wherein" clause, the server need only be "capable of delivering" the data it receives from the presenter, and the LiveDemo source code contains several modules that allow for the delivery of uncompressed, compressed, differenced, and base data. Pl.'s Opp'n at 6:18-26; Klausner Decl. ¶ 12. However, Pixion's expert does not provide evidence or explanation of whether or how these modules transmit the four enumerated data types. In addition, Pixion's argument does not address the fact that the server merely relays the data it receives from the presenter, and is not "able to deliver data updates selected from any of the enumerated data types," as the patent requires.

The Court finds literal non-infringement of this limitation.

### C. "chosen by taking into consideration each of the following: the network connections speeds and loads, conference server computing speeds and loads, and client computing speeds and loads"

Third, PlaceWare argues that the LiveDemo server does not choose an output data type by taking into account each of the enumerated factors, for both of the reasons discussed above: LiveDemo does not take into consideration *each* of the enumerated parameters, and it does not *select* an output data type. Rather, the server re-transmits the output data type in the same format in which it was received. Nichols Decl. ¶¶ 8-9.

Pixion argues that LiveDemo selects the type of output data to send "based upon the acknowledgment

6

process using flow control," Pl.'s Opp'n at 7:5-6, and that at the outset, the minimum requirements act to "select" a data type, because "if a user 'dials in with a slow 286-type, 25Mhz computer on a slow 2400-baud modem, the LiveDemo system decides not to deliver any of the enumerated data types." Pl.'s Opp'n at 7:20-22; Klausner Decl. ¶ 6. Thus, Pixion contends that this decision "to not send any of the enumerated data types" – though due to a client's failure to meet the minimum requirements – "constitutes a selection." Id. at 7:25-26. Here, as with the first "wherein" clause, Pixion's minimum requirements and flow control arguments fall flat. PlaceWare's expert has offered specific facts that LiveDemo does not make any decision to select an output data type, and it does not consider each of the enumerated parameters. The LiveDemo feature of Conference Center merely receives data from a presenter and re-transmits that data to the attendees. There is no literal infringement of the claim.

### D. Doctrine of equivalents

PlaceWare contends that Pixion has also not shown infringement under the doctrine of equivalents. Pixion argues that there remain issues of fact regarding whether flow control, the acknowledgment process, and minimum requirements operate to "take into consideration" the enumerated parameters and "select" a data type based on enumerated parameters. Specifically, the claim language does not specify when parameters must be monitored, and Pixion contends that "LiveDemo's decision to monitor the parameters at the outset is not substantially different from the active, ongoing 'monitoring' process urged by PlaceWare." Pl.'s Opp'n at 9:5-6. In addition, Pixion contends that LiveDemo performs the equivalent of "selecting a data type based upon enumerated parameters" through the acknowledgment process, which:

> us[es] a packet of information that allows the server to customize the blocks of data sent, including those blocks of data that have "changed" from the last acknowledgment – which is based on the client computing speeds and loads, and network computing speeds and loads.

Klausner Decl. ¶ 11.

PlaceWare argues that Pixion has not established infringement by equivalents because (1) it failed to disclose its equivalents analysis in its Infringement Contentions or in Klausner's Rule 26 Expert Report, and thus

7

the argument is waived[2]; (2) there is no evidence that LiveDemo actually establishes any minimum requirements; and (3) file history estoppel bars Pixion from now arguing that the flow control process is equivalent to the claim elements.

The Court concludes that the doctrine of file history estoppel bars Pixion from arguing that flow control is equivalent. During prosecution of the patent, the patent examiner deleted Pixion's language describing "flow control" and required the addition of the three "wherein" clauses at issue. When a narrowing amendment is made to secure a patent, there arises "a presumption that the patentee surrendered the territory between the original claims and the amended claims." Glaxo Wellcome, Inc. v Impax Labs, Inc., 356 F.3d 1348, 1351-52 (Fed. Cir. 2004) (relying on Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 741, 122 S. Ct. 1831 (2002). PlaceWare argues that these amendments create a presumption that Pixion "surrendered the subject matter between the original 'flow control' claim language and the amended *wherein* claim language." Def.'s Reply at 11:12-13.

The Court agrees. The language proposed by the patentee for Claim 1 was:

> wherein the at least one client maintains a version of a shared portion of a data set which is <u>updated at a rate dependent on</u> the network connections speeds and loads and client computing speeds and loads . . .

Supp. Walker Decl. Ex. I at PW-PIX 000318 (emphasis added).

The patent examiner stated that "[i]t would have been obvious to one of ordinary skill in the networking art at the time the invention was made to have realize[d] that the process of updating within a network can only occur as fast at the rate in which the network is able to accommodate." Id. at PW-PIX 000334-335. The words "updated at a rate dependent on" were ultimately deleted from the claim and replaced by a wherein clause: "wherein the conference server updates said version of said shared portion of said display after taking into consideration." The amended claim language read:

> wherein at least one client maintains a version of a shared portion of a display, <u>wherein the conference server updates said version of said shared portion of said display after taking into consideration</u> the network connections speeds and loads and client computing speeds and loads . . .

Id. at PW-PIX 000345.

---

[2] Pixion's doctrine of equivalents argument appears in Pixion's opposition brief, and the supporting citation is ¶ 11 of the Klausner Declaration.

8

1   The Court finds that this amendment narrowed the scope of the claim and applies the presumption that the
2   patentee surrendered the flow control concept when the amendment was made. Pixion has not, and likely
3   cannot, rebut this presumption. Accordingly, file history estoppel applies, and there is no infringement by
4   equivalents.

5   The Court GRANTS defendant's motion for summary judgment of non-infringement of the '313 patent.

## II.  Defendant's Motion for Summary Judgment on Plaintiff's Trade Secret Claim

PlaceWare brings this motion on the grounds that Pixion's purported trade secrets do not satisfy the standard set out in § 3426.1(d) of the California Civil Code. Section 3426.1 defines trade secret as "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1. PlaceWare contends that Pixion's trade secrets fail to meet either prong of this test, but particularly fail the second prong because all of Pixion's claimed trade secrets were publicly disclosed (1) by Pixion, in various public documents; (2) in publicly-available NV code developed by Ron Frederick at Xerox Palo Alto Research Center ("Xerox PARC") in the early 1990s; and (3) in the Jupiter program, which implemented the NV code and was designed by PlaceWare's founders. The Jupiter program served as the basis for PlaceWare's first conferencing product.

### A.  Identity of the trade secrets

As a threshold matter, the parties dispute whether Pixion is bound by its description of the trade secrets in the C. C. P. § 2019(d) statement, or whether it may provide further "details" of them in opposition to this motion.[3]

---

[3] Most of the details are contained in the Declaration of Peter Madams ("Madams Decl."). PlaceWare has raised evidentiary objections to the Madams declaration, on grounds that it contains inadmissible hearsay and that statements in it lack foundation and express improper expert and legal opinion. PlaceWare also objects to the Declaration of David Klausner, Pixion's expert, in opposition to this motion, on grounds that it contains hearsay and opinion based on information and belief rather than on personal knowledge or proper expert opinion. The Court has reviewed these declarations and hereby OVERRULES PlaceWare's objections.

9

In its § 2019(d) statement, Pixion identified six features of its invention that involve trade secrets: (1) a real-time computer visual conference; (2) multi-speed architecture; (3) capture frame capability; (4) blocking functionality; (5) multi-platform capability; and (6) dynamic distributed "CODEC" software. Chow Decl. Ex. A (Pl.'s Supp. Trade Secret Disclosure). PlaceWare previously moved for a protective order to suspend the proceedings until Pixion provided an adequate § 2019(d) disclosure. At oral argument on that motion, Pixion stated that it was "willing to live with our 2019, it's very detailed," and that "we have a 12 page statement [that] sets forth our trade secrets the way . . . a detailed table of contents would set forth the contents." Chow Decl. Ex. B, December 12, 2003 Hearing Tr. at 9:1-2; 10:104. PlaceWare argues that, based on Pixion's representation and the applicable law, Pixion cannot now defeat summary judgment by providing further details not included in its § 2019(d) statement.

Under C.C.P. § 2019(d), a party alleging misappropriation of trade secrets "shall identify the trade secret with reasonable particularity." The California court of appeal has held that this requires "sufficient particularity to separate [the secret] from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." Diodes, Inc. v. Franzen, 260 Cal. App. 2d 244, 253 (1968).[4] The Diodes court further defined the scope of a § 2019(d) disclosure:

> One who seeks to protect his trade secrets from wrongful use or disclosure does not have to spell out the details of the trade secret to avoid a demurrer . . . to so require would mean that the complainant would have to destroy the very thing for which he sought protection by making public the secret itself.

Diodes, 260 Cal. App. 2d at 252.

According to Pixion, § 2019(d) only requires it to give PlaceWare reasonable notice of its trade secrets, not to set forth the details of the secrets themselves. Pixion also relies on Whyte v. Schlage Lock Co., 101 Cal. App. 4th 1443, 1452-53 (2002), where the California court of appeal found sufficient a § 2019(d) designation listing various general categories of information, such as "pricing of [defendant's] products" and "profit margins

---

[4] The Diodes court stated that "[i]f the subject matter of the claimed trade secret is a manufacturing process, the plaintiff must not only identify the end product manufactured, but also supply sufficient data concerning the process, without revealing the details of it, to give both the court and the defendant reasonable notice of the issues which must be met at the time of trial and to provide reasonable guidance in ascertaining the scope of appropriate discovery." Diodes, 260 Cal. App. 4th at 253.

on [defendant's] products."

While Pixion is correct about what § 2019(d) requires, the issue here is what "reasonable notice of the issues which must be met at the time of trial" and "reasonable guidance in ascertaining the scope of appropriate discovery" are under these circumstances. Diodes, 260 Cal. App. 2d at 252. In Computer Economics, Inc. v. Gartner Group, Inc., 50 F. Supp. 2d 980 (S.D. Cal. 1999), the court observed that the disclosure rule for trade secrets serves four purposes: (1) to "promote[] well-investigated claims and dissuade[] the filing of meritless trade secret complaints"; (2) to "prevent[] plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets"; (3) to "assist[] the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope"; and (4) to "enable[] defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation." 50 F. Supp. 2d at 985. Pixion expressly represented to the Court and parties that its § 2019(d) statement was a complete statement of the secrets. Yet periodically throughout its opposition, Pixion contends that while a functionality listed in the § 2019(d) statement is not secret, the "how to" of that functionality is. The Court notes that Pixion could have written its § 2019(d) statement to reflect this difference, without revealing the technical details that comprise the trade secrets themselves. Allowing Pixion to defend against summary judgment by asserting now that its method is secret even if the functionality disclosed is not would defeat the purposes of § 2019(d), limiting both PlaceWare's ability to defend against the trade secret claim and the Court's ability to review the issue of secrecy.

Consequently, the Court considers whether Pixion's trade secrets, as pled, comport with the requirements of § 3426.1.

### B. Secrecy of the trade secrets

The central question is whether Pixion's trade secrets, as defined in their § 2019(d) statement, were secret, meaning: (1) they were valuable because they were unknown to others, and (2) Pixion attempted to keep them secret. DVD Copy Control Ass'n, Inc. v. Bunner, 116 Cal. App. 4th 241, 251 (2004). Under DVD Copy Control Ass'n, "the concern is whether the information has retained its value to the creator in spite of its publication." 116 Cal. App. 4th at 251.

11

Pixion contends that the various documents PlaceWare relies on to demonstrate public disclosure of Pixion's trade secrets "were made available on a limited distribution basis" to prospective investors on a confidential basis, and were not publicly distributed. Pl.'s Opp'n at 2:19-20. However, as PlaceWare points out, none of these documents were the subject of efforts to maintain their secrecy. There is no evidence that Pixion's Business Plan and white papers contained any confidentiality restrictions or conditions. In addition, PlaceWare relies on a 1996 Technical Overview, available on Pixon's public website, and a product review in Computer Shopper magazine. From the record here, the Court concludes that none of Pixion's documents were confidential, and the descriptions of PictureTalk in them should be considered in evaluating Pixion's public disclosure of its trade secrets.

Accordingly, the Court considers whether the features of Pixion's invention[5] are trade secrets.

### 1.   Features of a real-time computer visual conference system

PlaceWare contends that the following features of a real-time visual conference system are not trade secrets:

(a)   capturing screen images, compressing them and sending them to a server;
(b)   transmitting images instead of graphic drawing commands;
(c)   data flowing back from an attendee client to the presenter client;
(d)   using a server to transmit data.

The Court finds that Pixion publicly disclosed all of these trade secrets. Pixion's further descriptions of (a) sending the compressed images to an "intelligent unicast server," (b) "transmitting arbitrary portions of external applications as images instead of as drawing graphic commands" using bitmaps, (c) "interactive graphical prompts and text information flowing from attending clients to both the presenter and other attendee clients," and (d) the method by which PictureTalk employs algorithms to control images in the data stream so that all users experience the conference in real time, do not preserve the secrecy of the trade secrets as pled.

The Court GRANTS summary judgment as to these four alleged trade secrets.

### 2.   A multi-speed architecture for a computer conference system

---

[5] Because the parties dispute the appropriate title for several of the trade secrets, the Court adheres to the descriptive terms used by Pixion in its § 2019(d) disclosure. See Chow Decl Ex. A.

PlaceWare also argues that the following characteristics of "a multi-speed architecture for a computer conference system" are not trade secrets:

(a) attendee clients retrieving data rather than senders pushing data;
(b) each client running at its own speed;
(c) skipping or dropping older data, or combining it with newer data; and
(d) slower clients missing intermediate changes.

Pixion clarifies that (a) is really PictureTalk's ability to have attendee clients receive unicast data at their own rate, and (b) is "clients running at their own speed with slow clients not slowing down the entire presentation." It argues that it has never disclosed the technical details used to accomplish these functionalities. The Court finds that adding these details does not affect or preserve the trade secrets, which were publicly disclosed. The motion is GRANTED as to (a) and (b).

For (c), the Court does not consider this secret to have been disclosed by the 1996 article stating "[s]ervers can 'composite' changed images over time, and then parse them out in a coded, compressed state to other servers on the network, to minimize network utilization. These same images can then be locally distributed to attending clients on an as-needed or as-ready basis." Chow Decl. Ex. F at 1. It also appears that the NV and Jupiter programs do not have the functionality described. For (d), PlaceWare does not argue that Pixion publicly disclosed this trade secret, but rather that the Jupiter system's "multicast to unicast gateway" allowed clients to choose different resolution images, and slower clients who chose a lower resolution image would not receive all intermediate changes as a result. Pixion's § 2019(d) statement actually states: "[s]low clients miss intermediate changes, a type of time-compression or resolution-compression that preserves real-time response (keep clients up to date, does not allow them to fall behind) at the cost of seeing an intermediate state." Chow Decl. Ex. A at 7:9-11. The Court is persuaded that this functionality is different from NV and Jupiter's.

PlaceWare's motion is DENIED as to trade secrets (c) and (d).

### 3. Capture frame technique

PlaceWare argues that capturing pixels within a frame on the screen is not a trade secret. This technique is comprised of several features:

(a) transmitting frames at a slower rate

13

  (b) resizing the capture frame;
  (c) displaying the capture frame as a full screen; and
  (d) changing the color of the capture frame.

The Court finds that none of the features pled is a trade secret. For (a), Pixion now argues that the correct description of this trade secret is that frames do not always have to be transmitted at a "constant frame rate," and that this trade secret involves "frame rate adaptation" using dynamic algorithms. Madams Decl. ¶ 23. The Court finds that nothing about the constancy or adaptability of the frame rates is reflected in Pixion's § 2019(d) statement, and thus Pixion is not helped by the disclosure of this further detail.

  Alleged trade secrets (b) and (c) deal with what Pixion calls in its opposition the PictureTalk "dynamic resizing capability." The Court agrees with PlaceWare that the addition of "dynamic" does not preserve the secrecy of this disclosed feature.

  For (d), the trade secret has been publicly disclosed in the PictureTalk User's Guide. Chow Decl. Ex. I at 44. Pixion's further description of this alleged secret as "changing the color of the capture frame to indicate changes in the conference status" does nothing to preserve its secrecy, since this is the precise functionality described in the User's Guide.

  The motion is GRANTED as to all four of these alleged trade secrets.

### 4. Blocking the capture frame

  PlaceWare argues that "dividing the capture frame into blocks" involves the following, which are not trade secrets:

  (a) scanning the areas within the capture frame;
  (b) dividing the buffer into blocks;
  (c) transmitting raw data blocks;
  (d) transmitting differenced blocks;
  (e) using compression algorithms to reduce the volume of data in the block;
  (f) transmitting blocks using "UDP or multi-cast protocol"; and
  (g) varying the size of the blocks.

For alleged trade secrets (a), (c), (d) and (e), the Court finds that, as pled, they have been publicly disclosed or are performed by the NV code and/or Jupiter program. Pixion's further clarifications are unavailing: (a) the "visual feedback functionality" of PictureTalk's scanning feature is not mentioned in the § 2019(d) designation; (c) stating that the blocks "can undergo future processing by a downstream CPU" does not preserve its

secrecy, since NV performs this functionality; (d) adding the word "intelligently" does not demonstrate how PictureTalk transmits differenced blocks differently from NV; and (e) despite Pixion's statement that its compression algorithm is "adaptive" and more "sophisticated" than NV's, its § 2019(d) statement states "[i]n either case, raw image or difference, conventional compression algorithms may be used to reduce the volume of data." Chow Decl. Ex. A at 10:1-2. For (f), Pixion contends that PlaceWare has misstated this trade secret, which is "transmitting blocks using either a UDP unicast or multicast protocol." But the § 2019(d) disclosure says "[a]llows for the use of UDP and multi-cast protocols instead of TCP." Chow Decl. Ex. A at 10:6. This language does not imply the ability to operate entirely over a unicast transmission.

Consequently, the Court GRANTS summary judgment as to alleged trade secrets (a), (c), (d), (e), and (f).

For (b), PlaceWare does not argue that Pixion disclosed this alleged secret publicly, but rather that the NV code also divides the capture frame into blocks. Pixion contends that the blocks are "variable sized" and "network optimized," and that the NV code can only divide images into blocks of a single size. Klausner Decl. ¶ 19. The Court finds that Pixion's trade secret is defined in its § 2019(d) statement as: "[b]lock size chosen dynamically for optimum performance." See Chow Decl. Ex. A at 9:25-26. NV does not perform the same functionality. Similarly, for (g), Pixion contends that this trade secret is not based simply on varying block sizes, but on PictureTalk's "use of a dynamically variable block size based on network optimization." Pl.'s Opp'n at 18:13. According to Pixion, NV does not have this ability to vary block size. The Court finds that the trade secret of varying block size is choosing block size "so that the resulting raw data or difference, compresses or not, match the network." Chow Decl. Ex. A at 10:8-9. The NV capability does not choose these block size features in order to match the network. Consequently, this trade secret appears to be secret.

PlaceWare's motion is DENIED as to trade secrets (b) and (g).

### 5. System that is portable across platforms; "multi-platform capability"

PlaceWare also argues that the following features of a system that is portable across platforms are not trade secrets:

(a) accounting for the differences between Windows and MAC operating systems;
(b) mapping between screen resolutions using various bit colors;

15

  (c)  transmitting different color bitmaps;
  (d)  accounting for different screen resolution in Unix X-Windows systems; and
  (e)  server software written in a portable programming language.

All of these alleged trade secrets have been publicly disclosed or are performed by NV code or the Jupiter program. Pixion further clarifies that (a) the secret is not simply PictureTalk's multi-platform capability, but the manner in which it accomplishes that feature; (b) the secret is not simply mapping, but PictureTalk's "platform-independent color mapping algorithms"; and (c) the secret is not simply transmitting different color bitmaps but the "automatic" "translation of bit maps between any color depths," accomplished by the color mapping algorithms. Pixion does not address alleged trade secrets (d) and (e) separately.

  Under the principles of Diodes and Computer Economics, this attempt by Pixion to clarify that its trade secret is not PictureTalk's functionality but the technical details and algorithms implementing that functionality is unavailing. As disclosed in its § 2019(d) statement, the trade secrets are not secret.

  Summary judgment is GRANTED as to all of these alleged trade secrets.

### 6.  Dynamic distributed CODECS

PlaceWare argues that this feature is not a trade secret, including:

  (a)  treating the conference software as one item running on a distributed computer;
  (b)  using network protocols that identify packet types so that each can be processed appropriately and differently;
  (c)  using network traffic to measure performance characteristics; and
  (d)  using timestamps to keep track of response times.

Here, Pixion argues that for (a), PictureTalk performs the publicly disclosed functions in a "dynamic" fashion using certain algorithms; for (b), the PictureTalk server can inspect packets "to determine how to process them in an intelligent manner," Pl.'s Opp'n at 20:4-5; for (c), the NV software requires a person to manually change bandwidth settings, while PictureTalk contains adaptive algorithms to accomplish this feature.; and for (d), NV and Jupiter do not "perform[] multi-client stream management in the same manner as PictureTalk." Klausner Decl ¶ 28. These further clarifications do not preserve the secrecy of these alleged secrets, all of which have been publicly disclosed.

  Consequently, the Court GRANTS summary judgment as to all of these alleged trade secrets.

**CONCLUSION**

For the foregoing reasons, and for good cause shown, the Court hereby GRANTS defendant's motion for summary judgment of non-infringement of the '313 patent and PARTIALLY GRANTS and PARTIALLY DENIES defendant's motion for summary judgment on plaintiff's trade secret claim. [Docket #s 142 and 146]

**IT IS SO ORDERED.**

Dated: January 12, 2005                                S/Susan Illston
                                                       SUSAN ILLSTON
                                                       United States District Judge