SPENCER HOSIE (CA Bar 101777)
JAMES T. McCARTT (CA Bar 121983)
GEORGE F. BISHOP (CA Bar 89205)
HOSIE FROST LARGE & McARTHUR
One Market – Spear Tower #2200
San Francisco, CA 94105
Phone: 415-247-6000
Fax: 415-247-6001

ROBERT J. YORIO (CA Bar 93178)
JASON T. ANDERSON (CA Bar 212938)
CARR & FERRELL LLP
2200 Geng Road
Palo Alto, CA 94303
Phone: 650-812-3400
Fax: 650-812-3444

Attorneys for Plaintiff Pixion, Inc.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| PIXION, INC., | ) Case No. C 03 2909 SI |
|        Plaintiff, | ) |
| | ) **PIXION'S OPPOSITION TO** |
| | ) **PLACEWARE'S MOTION** |
| vs. | ) **IN LIMINE CONCERNING** |
| | ) **UNJUST ENRICHMENT DAMAGES** |
| | ) |
| PLACEWARE, INC., | ) **Pretrial conference:  January 25, 2005** |
|        Defendant. | ) **Trial date:  January 31, 2005** |
| | ) |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   Introduction and Summary                                                1

II.  Factual context                                                        3

III. Legal context                                                          5

   A.   Expert testimony under Rule 702                                     6

   B.   The right to unjust enrichment in a trade secrets case             7

   C.   Fact of damage vs. amount of damages                               8

IV.  Dr. Leitzinger's market share analysis is reasonable and reliable.    8

   A.   Dr. Leitzinger reasonably chose to use Frost & Sullivan data.      8

      1.   IDC combines web conferencing and document conferencing.        9

      2.   IDC excludes web hosting revenues.                             10

      3.   IDC excludes revenues from reseller sales.                     10

   B.   Dr. Leitzinger's market share calculations are reasonable.        11

   C.   Dr. Leitzinger accounts precisely for the change in the way
        Frost & Sullivan presented web conferencing data between 1999
        and 2000                                                          11

   D.   PlaceWare attacks the same Frost & Sullivan data that
        it has relied upon and that its own expert cites in this case.    12

   E.   Dr. Leitzinger's attribution of 6% market share gain To LiveDemo
        is appropriate.                                                   13

V.   PlaceWare's legal arguments are without merit.                       14

   A.   The acquisition price is highly relevant to measuring PlaceWare's
        unjust enrichment.                                                14

   B.   The damages period extends beyond the liability period.          18

   C.   The calculation of unjust enrichment damages is not
        "overly simplistic and speculative."                             20

# **TABLE OF CONTENTS**

**Page**

D.    Trade secret damages are not limited to PlaceWare's
      "cost savings."                                                    21

E.     The unjust enrichment damages are not too big.                   24

F.    Dr. Leitzinger's enrichment analysis also applies to
      Pixion's contract claim.                                          25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                    <u>Page</u>

*Alcatel USA, Inc. v. Cisco Systems*,
    239 F.Supp.2d 645 (E.D. Tex.2002)
    *appeal dismissed per settlement,* 2004 WL 557285 (Fed.Cir.2004)           14, 15

*Bigelow v. RKO Pictures, Inc.*,
    327 U.S. 251 (1946)                                                           8

*California Lettuce Growers, Inc. v. Union Sugar Co.*,
    289 Cal.2d 474 (1955)                                                         8

*Celeritas Technologies, Ltd. v. Rockwell International Corp.*,
    150 F.3d 1354 (Fed.Cir.1998)                                                  8

*Children's Broadcasting Corp. v. Walt Disney Co.*,
    245 F.3d 1008 (8th Cir.2001),
    *on remand,* 2002 WL 1858759 (D.Minn.2002),
    *appeal after remand,* 357 F.3d 860 (8th Cir.2004)              17, 18, 25

*Conwood Co., v. United States Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002), *cert. denied*, 537 U.S. 1148 (2003)           21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)                                                        2, 6

*Enterprise Manufacturing Co. v. Shakespeare Co.*,
    141 F.2d 916 (6th Cir.1944)                                                   7

*Forro Precision, Inc. v. IBM Corp.*,
    673 F.2d 1045 (9th Cir.1982)                                                  8

*Hartley v. Dillard's, Inc.*,
    310 F.3d 1054 (8th Cir. 2002)                                                 7

*KW Plastics v. United States Can Co.*,
    131 F.Supp.2d 1289 (M.D.Ala.2001)                                            20

*Landsberg v. Scrabble Crossword Game Players, Inc.*,
    802 F.2d 1193 (9th Cir. 1986)                                                25

*Lepage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir.2003), (en banc)
    *cert. denied*, 124 S.Ct. 2932 (2004)                                        21

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Lithuanian Commerce Corp. v. Sara Lee Hosiery*,
   179 F.R.D. 450 (D.N.J.1998)                                              20

*Litton Systems, Inc. v. Ssangyong Cement Industrial Co.*,
   107 F.3d 30, 1997 WL 59360 (Fed. Cir.1997) (table)                      22, 23

*Marsu, B.V. v. Walt Disney Co.*,
   185 F.3d 932 (9th Cir.1999)                                              8

*Mathis v. Exxon Corp.*,
   302 F.3d 448 (5th Cir. 2002)                                             21

*Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*,
   908 F.2d 706 (11th Cir.1990)                                             23

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
   969 F.2d 410 (7th Cir.1992)                                              20

*Snepp v. United States*,
   444 U.S. 507 (1980)                                                      25

*Sokol Crystal Products, Inc. v. DSC Communications Corp.*,
   15 F.3d 1427 (7th Cir.1994)                                              22

*Sonoco Products Co. v. Johnson*,
   23 P.3d 1287 (Colo.App.2001)                                            23, 24

*Storage Technology Corp. v. Cisco Systems, Inc.*,
   2003 WL 22231544 (D.Minn. 2003)                                          14

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931)                                                      8

*Stott v. Johnston*,
   36 Cal.2d 864 (1951)                                                     8

*Transclean Corp. v. Bridgewood Services, Inc.*,
   290 F.3d 1364 (Fed.Cir.2002)                                             15

*University Computing  Co. v. Lykes-Youngstown Corp.*,
   504 F.2d 518 (5th Cir. 1974)                                            7, 22

# TABLE OF AUTHORITIES

**Page**

## Statutes

Cal.Civ.Code § 3426.3                                                                7, 21

Fed.R.Evid. 403                                                                          24

Fed.R.Evid. 702                                                                           6

## Other Authorities

Manual for Complex Litigation, Fourth §23.24 at 479                                        6

Manual for Complex Litigation, Fourth, (Fed.Jud.Ctr.2004)                                  6

4 Milgrim on Trade Secrets, § 15.02[3][c]                                                  7

Model Patent Jury Instructions
    for the Northern District of California (2004) no. 5.3a                            20

Restatement (Third) of Restitution and Unjust Enrichment
    (Council Draft 6, 11/12/04) § 39                                               7, 25

Restatement (Third) of Restitution and Unjust Enrichment
    (Council Draft 6, 11/12/04) § 42                                                   7

Restatement (Third) of Unfair Competition § 45                                             7

**PIXION'S OPPOSITION TO
PLACEWARE'S MOTION
IN LIMINE CONCERNING
UNJUST ENRICHMENT DAMAGES**

As set forth below, Pixion opposes PlaceWare's "Motion in Limine to Exclude Evidence of Enterprise Value as Basis for Calculating Unjust Enrichment Damages."

## I.    Introduction and Summary

PlaceWare mischaracterizes *what* Dr. Leitzinger did, *how* he did it, and *why* he did it.  In order to determine the market share effect of PlaceWare's 1999 breakthrough LiveDemo product, Dr. Leitzinger used an approach that would consistently measure market share over time.  To make sure that his data included the right elements (*e.g.*, reseller revenue) and excluded the wrong (*e.g.*, revenues from the distinct business sometimes labeled as "document conferencing"), Dr. Leitzinger used data from Frost & Sullivan (F&S), rather than data from IDC.  He made two corrections to the historical F&S data to estimate market shares in 1997 and 1998, given a gap in the data, and based those corrections on PlaceWare's own accounting records.

In his work, Dr. Leitzinger drew distinctions that Microsoft itself drew in describing its PlaceWare acquisition to the Department of Justice in its HSR filings.  He also used documents that PlaceWare itself historically relied upon, and documents now relied upon by Mr. Paul Meyer, PlaceWare's damages expert in this case.  PlaceWare mentions none of these facts to the Court.

By arguing that the Microsoft acquisition economics are "irrelevant," PlaceWare is saying that it is entitled to retain – as a matter of law – the real benefit that it derived from misappropriating Pixion's trade secrets and breaching the parties' contract.  In an emerging software market, PlaceWare well knew that what truly mattered was building market share and

leadership.  This goal was its explicit business plan: "Dominate large, rapidly growing segments of the market, where our technology and our first mover advantage will provide us with a sustainable product and branding advantage over potential new entrants."  Exhibit A, at PW-PIX 64905-06 (April 1999 business plan).[1]  If PlaceWare won that race, then it would have something of real value.

It did win the race, and it did so in significant part because of technology misappropriated from Pixion.  In 1999, PlaceWare absolutely understood that it could not compete absent fully scalable "app-demoing" technology, *i.e.*, the ability to demonstrate an application in real-time.  Not having the time or money to develop an app-demoing product independently, PlaceWare simply lifted critical ideas from Pixion and released its breakthrough LiveDemo product in July 1999.

With the release of LiveDemo, PlaceWare's market share grew rapidly.  It established the market "domination" it sought.  And the reward came in the form of the sale to Microsoft.

Under PlaceWare's view of the law, all of this is irrelevant.  It says Pixion's unjust enrichment damages should be capped at PlaceWare's avoided cost, *i.e.*, the theoretical cost of licensing the technology from a third party.  But this ignores the economic reality – the real benefit that PlaceWare derived.

Nor is that all.  PlaceWare's Motion in its entirety is a factual argument disguised as a legal argument.  PlaceWare does not file a genuine *Daubert* challenge, because there is no justification for one.  It does not try to show that experts do not ordinarily rely on the kind of evidence used by Dr. Leitzinger, nor does it explain the "unreliable" label it attaches to evidence

---

[1]    The exhibits referenced herein are attached to the accompanying declaration of James T. McCartt.

often taken from its own files.  Instead, it largely ignores the evidence and Dr. Leitzinger's reasoned explanations.

Ultimately, PlaceWare is asking the Court to accept PlaceWare's factual position and reject Pixion's.  That is a function for the jury.

## II.   Factual context

As a high tech startup in an emerging technology market, PlaceWare's objective did not lie in near-term profitability or high operating margins.  To Pixion's knowledge, PlaceWare has never made an accounting profit, although it (and Microsoft) expect enormous profits beginning in the near future.  PlaceWare's plan, in fact, was to absorb losses while it grew its sales and market share, making future profits likely and making itself an attractive acquisition target.  Sure enough, Microsoft acquired PlaceWare in early 2003.  *See* opening report of Dr. Jeffrey Leitzinger ("Leitzinger Report") ¶¶35-37, 55-56. [2]

Instead of current profitability, PlaceWare cared about one thing: building value by building market share and brand recognition as quickly as it could.  Emerging software markets are characterized by network economies (the greater the user base, the more valuable the technology), tipping effects, and first mover advantages.  In these markets, leading positions in technology and market share are the things of real value.  *Id.*

As of late 1998, PlaceWare was losing this race.  It recognized that app demoing technology – the ability to show a software application in use in real-time – was a "required feature."  As its then-CEO Barry James Folsom put it, "[I]t is clear that in the high tech segment…  [Y]ou may not get the sale if you have [app demoing], *but you certainly will lose it if you don't…*."  Exhibit B (B.J. Folsom January 5, 1999 email to executive staff).  *See also*

---

[2]     The Leitzinger Report is attached to PlaceWare's Motion as Exhibit A.  His Supplemental Report is attached to the Motion as Exhibit D.

Exhibit C (Chris Ventris March 19, 1999 email; "I am promising demos of app showing to everyone (we lose the oppty without this commitment) in the next month or so ... Dave Nichols, please make it so").  App demoing was the critical ingredient missing from PlaceWare's offerings.

But PlaceWare did not have the money to license Pixion's app demoing technology – a point PlaceWare's damage expert now concedes.  Nor did it have the time or money to develop the feature organically.  And so, CEO Folsom asked Dave Nichols to build an app demo product that mimicked the features of the Pixion product.

Mr. Nichols claims he did so in just five months, by himself, working part-time, as he conceded at deposition. [3]  In critical respects, his LiveDemo product was just like Pixion's.  The server monitors each attendee client separately, and intelligently drops or combines data sent to slow attendees so that even the slowest could participate in a large scale web conference.  This solved the problem then bedeviling the industry, *i.e.*, designing a web conference product that could scale to over 1,000 users, could accommodate even the slowest attendees dialing in over a phone modem from a hotel room, yet not have the slow attendees set the pace for everyone.  This solution was critical for PlaceWare, because its business model lay in large scale meetings – 1,000 or more – with many participating via slow connections.  *See* Leitzinger Report ¶¶38-49.

PlaceWare released its "breakthrough" LiveDemo in July 1999.  Its internal documents recognized that PlaceWare's LiveDemo release "opens up a huge segment of the market place that was previously unavailable to us – those companies wishing to demo software applications…."  *See* Exhibit E.  *See also* Leitzinger Report ¶¶49-56.  PlaceWare's sales

---

[3]   This contrasts with Mr. Nichols' own conviction that it would take "10 engineering man years" just to integrate into PlaceWare's product app demo technology developed by someone else.  *See* Exhibit D (PlaceWare's expert's notes of Nichols interview).  And it is strikingly inconsistent with the 10-17 months PlaceWare's board was told it would take to build a replacement.  In August 2002, it embarked upon Project Safety Net, *i.e.*, replacing the Dave Nichols' LiveDemo with a product independently developed through a clean room protocol.

immediately soared, rising from about $1 million in 1998 to $51 million by 2002. *See* Leitzinger

Report Exh. 5. Its market share took off at the same time, increasing from 10 percent in 1998 to

over 16 percent in 1999, and maintaining that market share gain through the time of PlaceWare's

acquisition by Microsoft. *Id.* Exh. 4.

By the end of 1999, PlaceWare had a commanding market presence based on its superior

LiveDemo technology, taken from Pixion. As had been its plan all along, PlaceWare looked for

what its bankers called a "liquidity event," either a sale to the public via IPO or an acquisition.

PlaceWare immediately began seeking an IPO in 1999, but when it did not materialize,

PlaceWare positioned itself as an acquisition target. Microsoft, in large part based upon the

LiveDemo technology and the resulting market share advantage that persisted to the time of the

acquisition, acquired PlaceWare in early 2003 for a gross price of $247 million. Leitzinger

Report ¶¶34, 64.

In this way, PlaceWare's shareholders realized the profit from Pixion's technology.

Microsoft's real-world acquisition price of $247 million provides the best evidence of the value

of the profit stream expected to flow to PlaceWare (again, built in substantial part on Pixion

technology). Indeed, internal Microsoft documents show that Microsoft valued PlaceWare's

expected profit flow much higher – as high as $1.2 billion. Leitzinger Report ¶¶57-58;

Declaration of Jeffrey Leitzinger ("Leitzinger Decl.") ¶¶25-28. Dr. Leitzinger's method of

quantifying the portion of the value of these profits that is attributable to the Pixion technology

focuses, simply and appropriately, on the contribution by this technology to PlaceWare's market

share, a well recognized metric for business success, and indeed the key factor for PlaceWare's

success as recognized by PlaceWare and Microsoft themselves. Leitzinger Report ¶¶57-64.

## III.    Legal context

Pixion submits that Dr. Leitzinger's approach to measuring PlaceWare's damages

exposure is totally mainstream, subject to no reasonable objection. PlaceWare is trying to argue

disputed expert factual testimony as if it could be a matter of law.  This is not a proper approach to damages.

A.    __Expert testimony under Rule 702__

Under Rule 702, a party may offer expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue," if (1) the testimony is "based upon sufficient facts or data," (2) it is "the product of reliable principles and methods" and (3) the expert "has applied the principles and methods reliably to the facts of the case."  Fed.R.Evid. 702.

In deciding whether to admit expert testimony, "[t]he inquiry envisioned by [prior] Rule 702 is, we emphasize, a flexible one."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993).

> A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.  *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  As the Court in *Daubert* stated:  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Advisory Committee Note to 2000 amendment to Fed.R.Evid. 702 (citations omitted).  Thus, the court's "gatekeeping role is simply to guard the jury from considering as proof pure speculation presented in the guise of legitimate scientifically-based expert opinion.  It is not intended to turn judges into jurors or surrogate scientists."  Manual for Complex Litigation, Fourth, §23.353 at 511, n. 1716 (Fed.Jud.Ctr.2004). [4]

---

[4]    "The original intent of Rule 702 … was to liberalize, not restrict, the admission of expert evidence.  A judge must be cognizant of the constraints imposed by the Seventh Amendment and not preclude the jury from hearing an opinion that, although in the minority, is nonetheless responsibly grounded in the science and reliable even if the judge does not believe the conclusion to be 'correct.'  Presumably, cross-examination and presentation of contrary evidence by the opposition party, as suggested in *Daubert*, would identify for the jury the shakiness of the foundation on which the conclusion is based."  Manual for Complex Litigation, Fourth §23.24 at 479.

… (Footnote continued on next page) …

**B.     The right to unjust enrichment in a trade secrets case**

The California statute expressly gives a trade secret plaintiff the right to damages based on the misappropriator's unjust enrichment.  Cal.Civ.Code § 3426.3(a) ("a complainant also may recover for the unjust enrichment caused by misappropriation").  This remedy is consistent with traditional trade secrets law [5], and the flexibility that law provides the victim. [6]  PlaceWare has not challenged Pixion's right to recover unjust enrichment damages (once misappropriation is shown).

---

"As a general rule, the factual basis of an expert opinion goes to the credibility of his testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).

[5]     *See* Restatement (Third) of Unfair Competition § 45(a) ("One who is liable to another for an appropriation of the other's trade secret … is liable for the pecuniary loss to the other caused by the appropriation or for the actor's own pecuniary gain resulting from the misappropriation, whichever is greater");  Restatement (Third) of Restitution and Unjust Enrichment (Council Draft 6, 11/12/04) § 42(1) & § 42(3)(a) ("Except as otherwise provided by statute, a person who obtains a benefit by misappropriation … of another's legally-protected rights in any … information … is accountable to the holder of such rights for the benefit so obtained"; "As a general rule, a conscious wrongdoer, or one who assumes a known risk that the conduct in question violates the rights of the claimant, will be required to disgorge all gains (including consequential gains) derived from the wrongful transaction").  *See also, e.g.,* 4 Milgrim on Trade Secrets, § 15.02[3][c], at 15-189 ("Put in simplest terms, in cases where defendant has tortiously misappropriated, the money award can reflect either plaintiff's measurable loss occasioned by the wrong, or defendant's profits or other benefits").

[6]     In *University Computing  Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 536 (5th Cir. 1974) – a leading case, expressly relied upon by PlaceWare's damages expert – the court explained,

> Our review of the caselaw leads us to the conclusion that every case requires a flexible and imaginative approach to the problem of damages.  We agree with the Court of Appeals for the Sixth Circuit that "each case is controlled by its own peculiar facts and circumstances," Enterprise Manufacturing Co. v. Shakespeare Co., 141 F.2d 916, 920 (6th Cir.1944), and accordingly we believe that the cases reveal that most courts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation.  Naturally in some cases the damages will be subject to exact measurement … .  Where the damages are uncertain, however, we do not feel that uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown.

*Id.* at 538-39.

C.    **Fact of damage vs. amount of damages**

Once the fact of damage is established, PlaceWare bears the risk of any uncertainty in fixing the amount:

> [T]here was uncertainty as the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. …
>
> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.  In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.  The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. …  [T]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931). [7]

IV.    **Dr. Leitzinger's market share analysis is reasonable and reliable.**

A.    **Dr. Leitzinger reasonably chose to use Frost & Sullivan data.** [8]

PlaceWare questions Dr. Leitzinger's use of Frost & Sullivan data.  It says IDC data show that PlaceWare's market share actually decreased in 1999, not increased.  (Motion, at 7.)

---

[7]    *See also, e.g., Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264-65 (1946);  *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938-39 (9th Cir.1999);  *Forro Precision, Inc. v. IBM Corp.*, 673 F.2d 1045, 1052 (9th Cir.1982);  *Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d 1354, 1360 (Fed.Cir.1998);  *California Lettuce Growers, Inc. v. Union Sugar Co.*, 289 Cal.2d 474, 486-87 (1955);  *Stott v. Johnston*, 36 Cal.2d 864, 875 (1951).

[8]    For Dr. Leitzinger's market share analysis, *see* Leitzinger Report ¶¶ 50-64 and Exhs. 4-6; Supplemental Report ¶¶ 4-11 and Exh. 8; Leitzinger Depo. at 14-21, 38-49; Leitzinger Decl. ¶¶ 2-24.  The Leitzinger deposition is attached as Exhibit F, and the Leitzinger Declaration is a separate document.

Dr. Leitzinger used Frost & Sullivan data because it collects and organizes data in ways that are more relevant and informative for analyzing the issues in this case.  For those purposes, the IDC data is both over-inclusive and under-inclusive.

### 1.     IDC combines web conferencing and document conferencing.

F&S and IDC are both in the business of collecting data and publishing high technology market information.  But they measure the web conferencing market differently.  F&S distinguishes between "web conferencing" (larger scale conferences delivered over the Internet) and a different segment that F&S calls "document conferencing group systems and software" (which requires software specifically installed by a systems administrator).  Vendors in web conferencing – such as PlaceWare – distribute their product over the web, and their business model aims for point-and-shoot simplicity.  In contrast, "document conferencing" relies on software installed on a server by a network administrator.  F&S believes that these different products serve different markets; the evidence indicates PlaceWare's historical agreement; and Dr. Leitzinger agrees, too.  *See* Leitzinger Decl. ¶¶ 2-14.

The IDC data does not make this separation.  IDC lumps both web conferencing and document conferencing into an all-encompassing category.  *Id.*

Microsoft and PlaceWare understand the distinction.  In its HSR correspondence prior to closing the PlaceWare acquisition, Microsoft counsel carefully made the two-segment point.  *See* Exhibit G (February 28, 2003 Fried Frank letter to U.S. Department of Justice, at page 2; software-driven data conferencing products "are not a competitive substitute to the web conferencing service offered by PlaceWare and other web conferencing service providers").  Thus, PlaceWare now effectively characterizes as unreliable as a matter of law a distinction that Microsoft and it joined in making to the government.  *See* Leitzinger Decl. ¶ 10.

2.      **IDC excludes web hosting revenues.**

Although it includes document conferencing in its data, IDC excludes revenue earned

from "web hosting."  *See* Exhibit H (at BAV 16375).  Web hosting involves web conferencing

offered as a service, where the vendor uses its own servers and so hosts conferences for its

customers. [9]  PlaceWare began moving to a hosted business model in July 1998 (not July 1999,

as stated in its motion and in Mr. Meyer's report).  *Compare* Exhibit I (PlaceWare's Form S-1 at

PW-PIX 6014439; "In July 1998, we shifted the focus of our business model from sales of

software licenses to a hosted services model") with PlaceWare's Motion at 8 ("newly released

hosted-service format" in 1999) and Exhibit J (Meyer Report at 4; in 1999, "the move to

providing a hosted service … represented a fundamental change in PlaceWare's business

model").  In 1998, PlaceWare derived 31% of its overall revenue from hosting.  F&S includes

this type of revenue in assessing the web conferencing market, but IDC excludes it.  *See*

Leitzinger Decl. ¶ 11.

3.      **IDC excludes revenues from reseller sales.**

IDC excludes revenue from sales of web conferencing by branded resellers such as MCI

Worldcom and Sprint.  *See* Exhibit K at BAV 11895.  But this, too, has become an important

part of PlaceWare's business.  In measuring PlaceWare's market share over time, it would be a

mistake to ignore this component.  Once again, F&S data includes it, while the IDC series

excludes it.  Leitzinger Decl. ¶ 11.

---

[9]     A rough analogy is to the comparison between placing telephone conference calls with a carrier like AT&T
(web-conferencing via hosting), versus buying and installing an internal telephone hardware bridge (document
conferencing).

**B.     Dr. Leitzinger's market share calculations are reasonable.**

PlaceWare harshly claims that Dr. Leitzinger's market share calculations are a "forgery," that he did not use F&S data or PlaceWare's own records but "simply made up" the market shares, and that his market share analysis "is pulled from thin air."  (Motion, at 6-7.)

PlaceWare is mistaken.  Dr. Leitzinger's market share data is reliable – indeed, the best available for the purpose here – and his calculations are reliable.  Contrary to PlaceWare's contentions, Dr. Leitzinger did use F&S data and PlaceWare's own financial data, with appropriate adjustments.  As Dr. Leitzinger explains, although the F&S data are the best available, it was incomplete in two respects:  (1) it did not report firm-specific market shares for 1997 and 1998, and (2) it did not give PlaceWare credit for software marketed through resellers. Leitzinger Decl. ¶¶ 15-20; Supplemental Report Exh. 8.  Dr. Leitzinger reasonably and appropriately used 1997 and 1998 revenue numbers from PlaceWare's own financial reports, adjusted to reflect the different ways in which F&S and PlaceWare present this information.  *Id.* For the total market size (the denominator in a market share calculation), Dr. Leitzinger used F&S data for all years.  *Id.*  Dr. Leitzinger also made appropriate adjustments to account for reseller information.  *Id.* at ¶ 20.

Apparently PlaceWare resists Dr. Leitzinger's explanations (notwithstanding that PlaceWare deposed him on these issues at length, *see* Exhibit F at 14-21, 38-49), because it can attack his work only by mischaracterizing it.  His methods and calculations were completely reasonable and accurate, as described in his declaration.

**C.     Dr. Leitzinger accounts precisely for the change in the way
         Frost & Sullivan presented web conferencing data between 1999 and 2000.**

PlaceWare next complains that Dr. Leitzinger "ignores the very significant changes in the Frost & Sullivan definitions of the market upon which he relied."  (Motion, at 7.)  It argues that

Dr. Leitzinger improperly ignored three companies in 1999 (Centra, Lotus and Latitude), yet inconsistently used an F&S category that included those companies in 2000.  PlaceWare zestfully concludes that "Leitzinger ignores the complete recasting of the markets."  (*Id.* at 8.)

This is simply not true.  F&S indeed did not include Centra, Lotus and Latitude in 1999 in the web conferencing market, putting them in the separate document conferencing business.  In 2000, Dr. Leitzinger included web conferencing sales for the three companies, because F&S data showed that they had then entered the web-conferencing business.  Throughout, Dr. Leitzinger determined that F&S measured its web-conferencing market consistently across 1999 and 2000.  *See* Leitzinger Decl. ¶¶ 21-22.

Nor is PlaceWare correct in arguing that Dr. Leitzinger included resellers (MCI/Worldcom, Sprint, Global Crossing) in 1999 but ignored them in 2000.  As Exhibit 8 to Dr. Leitzinger's Supplemental Report demonstrates on its face, Dr. Leitzinger (following F&S) includes these reseller revenues in the web conferencing totals (the denominator in Column 8) for both 1999 and 2000.  Again, PlaceWare is wrong on its facts.  Leitzinger Decl. ¶ 20.

**D.     PlaceWare attacks the same Frost & Sullivan data that
        it has relied upon and that its own expert cites in this case.**

There is a wonderful irony here.  PlaceWare's damages expert Paul Meyer addresses the market for web-conferencing in ¶¶ 33-35 of his opening report.  Exhibit J.  Meyer states, "Industry reports from independent market research firms forecasted significant growth for the web conferencing market from 1999 to 2005 and beyond."  And he says, "Actual sales increases experienced by market participants such as PlaceWare, Webex, Raindance and Centra during this time period support this significant growth projections."  Exhibit J ¶¶ 33, 34.

The source for these conclusions?  **The very Frost & Sullivan data that PlaceWare now attacks as unreliable as a matter of law.**  *See*, *e.g.*, Exhibit J (Meyer Report, ¶ 33 n.40,

*citing* "U.S. Audio, Document, and Web-Conferencing Markets, Frost & Sullivan, 2000"; ¶ 33 n.41 (same); ¶ 34 n.42 (same)).  Mr. Meyer also relies on Frost & Sullivan data for 2001, as he does for 2002.  *See id.* ¶ 40 (quoting F&S 2001 report), ¶ 41 (quoting F&S 2002 report).

PlaceWare itself consistently relied upon F&S data.  *See*, *e.g.*, Exhibit L (PlaceWare slide "May 2000: Frost & Sullivan Report," reporting that F&S data put PlaceWare share at 51%, based on percentage of annual revenues).  And when PlaceWare provided market share information to Microsoft during Microsoft's due diligence, it worked from F&S data.  *See* Exhibit M at PW-PIX 6023869.  And Microsoft itself used F&S data in its internal analyses of the PlaceWare acquisition.  *See* Exhibit N at PW-PIX 035520 (page 4 of deck for "Final Approval Meeting," noting "service" market data is based on F&S data).

### E.     Dr. Leitzinger's attribution of 6% market share gain to LiveDemo is appropriate.

Contrary to PlaceWare's contention (Motion, at 8), Dr. Leitzinger carefully measured the increase in PlaceWare's market share due to LiveDemo, and he considered possible alternative explanations for PlaceWare's share gain.  *See* Leitzinger Report ¶¶50-64 and Exhibits 3, 4, 5; Leitzinger Supplemental Report ¶¶5-11.

As Dr. Leitzinger found, PlaceWare's sales had been small prior to 1999, then literally took off after the July 1999 introduction of LiveDemo, on a steep line reaching $51 million by 2002.  Leitzinger Report Exhibit 5.  LiveDemo brought PlaceWare key new customers.  *Id.* ¶ 53.  PlaceWare's market share, similarly, increased sharply immediately after the introduction of LiveDemo.  *Id.* Exhibit 4.  PlaceWare's own documents attributed PlaceWare's success to Live Demo.  *E.g.*, *id.*  ¶¶ 53, 60, 61; Leitzinger Supplemental Report ¶¶ 8-9.

Dr. Leitzinger *did* consider alternative explanations, and he refuted all of the alternatives offered by PlaceWare's expert Mr. Meyer.  Moving to a "hosting services" model could not explain the sales and market share increase, because, *e.g.*, PlaceWare had already moved to a

hosting model in 1998.  *Id.* ¶ 8.  All of the other product features that Mr. Meyer cites were

similarly released in 1998 or earlier, and so cannot explain the sharp upturn following

introduction of LiveDemo.  *Id.* [10]  As PlaceWare knows, these issues are discussed in Dr.

Leitzinger's reports.

## V.     **PlaceWare's legal arguments are without merit.**

### A.     **The acquisition price is highly relevant to measuring PlaceWare's unjust enrichment.**

PlaceWare says that as a matter of law, it is "inappropriate" to use the acquisition price in

calculating PlaceWare's unjust enrichment due to misappropriating Pixion's trade secrets.

PlaceWare is wrong.  To begin with, none of its three citations supports its proposed legal

rule.  *See Storage Technology Corp. v. Cisco Systems, Inc.*, 2003 WL 22231544 (D.Minn. 2003)

(unpublished) (Minnesota version of UTSA; given facts, unjust enrichment damages were

speculative) [11] ;  *Alcatel USA, Inc. v. Cisco Systems*, 239 F.Supp.2d 660-72 (E.D. Tex.2002)

(Texas trade secrets; rejecting reasonable royalty based on acquisition price), [12] *appeal dismissed*

---

[10]     Also, marketing PlaceWare's product does not explain PlaceWare's gains.  *E.g.*, superior product attributes rather than marketing were driving sustainable share gains.  Leitzinger Report ¶ 62; Supplemental Report ¶ 7.

[11]     According to the unpublished *Storage Technology* opinion, several Storage employees left to form NuSpeed, and Cisco later acquired NuSpeed.  As to Storage's trade secrets claim, which involved the design of hardware, the court states at least 6 grounds for granting summary judgment to Cisco.  2003 WL 22231544, *5-*10.  There was no evidence that the information was a trade secret, *id.* at *6-*7; there was no evidence that the defendant had used the information anyway, *id.* at *8-*9; and "it is undisputed that neither Cisco nor NuSpeed profited from Storage's alleged trade secrets."  In that context, it is not surprising that the court slams Storage's damages theory, which "attributes the entire acquisition price to the allegedly misappropriated trade secrets" and so is "rank speculation."  *Id.* at *10.

Nothing in *Storage Technology* suggests that consideration of an acquisition price makes for an inherently flawed analysis of unjust enrichment.

[12]     In *Alcatel*, Alcatel contractor Trnkus quit to join Monterey, and Cisco later acquired Monterey.  Alcatel alleged that Trnkus wrongfully took programs he designed at Alcatel.  The court first rules that Trnkus owned the programs, not Alcatel, which knocked out the trade secret claims.  239 F.Supp.2d 645, 660 (E.D.Tex.2002).

In the opinion cited by PlaceWare, 239 F.Supp.2d 660, despite stray references to unjust enrichment, the *Alcatel* court discusses why it rejects Alcatel's claim for a *reasonable royalty* based on the acquisition price.  *See Storage*

… (Footnote continued on next page) …

*per settlement*, 2004 WL 557285 (Fed.Cir.2004);  *Transclean Corp. v. Bridgewood Services, Inc.*, 290 F.3d 1364, 1375-76 (Fed.Cir.2002) (patent law; rejecting reasonable royalty based on acquisition price).[13]

More importantly, PlaceWare is wrong because the economics of Microsoft's acquisition of PlaceWare – including the enterprise value – are very relevant to the fair, reasonable quantification of PlaceWare's gain from the increase in its market share resulting from LiveDemo.  This was precisely the way PlaceWare positioned itself to realize the value of its products.

The early introduction of LiveDemo gave PlaceWare a competitive advantage – a genuine head start – in the then-erupting web conferencing market.  It boosted PlaceWare's

---

*Technology*, *supra*, 2003 WL 22231544, *9 n.3 (sole citation to *Alcatel* in Westlaw database; distinguishing *Alcatel* as a royalty case, not an unjust enrichment case).

*Alcatel*'s factual theory was that Monterey used Trnkus' programs to get into the "bake-off" for an AT&T contract, and then Cisco bought Monterey because it wanted to do business with AT&T.  *Id.* at 663-64.  But one problem for Alcatel was that after Cisco bought Monterey, AT&T promptly terminated its potential relationship and Cisco exited the business.  *Id.* at 665.  That is, Cisco paid something for nothing.  (This is what led Alcatel to pursue a reasonable royalty, since a reasonable royalty is calculated as of the [earlier] date of infringement, with less regard for eventual profitability.)

The court finds that Alcatel's royalty theory failed for several factual-specific reasons.  The "bake-off" chain of logic was speculative.  And there was no reason to think that in a hypothetical royalty negotiation, the parties would have negotiated a royalty equal to the entire price paid in the then-future acquisition.  *Id.* at 667-73.

There is *nothing* in Alcatel to suggest that an acquisition price is inherently irrelevant to an unjust enrichment analysis.

[13]    *Transclean* is a reasonable royalty case.  Patent law no longer permits unjust enrichment.  In *Transclean*, the infringer Bridgewood sold its assets to Century, then went out of business.  290 F.3d at 1368.  Century paid a royalty to Transclean for post-transaction sales.  *Id.*  The district court made Bridgewood pay a royalty for pre-transaction  sales (plus "additional damages").  *Id.* at 1375.

The question on appeal was whether Transclean was entitled to still *another* royalty, using the acquisition price as the royalty base.  Not surprisingly, the Federal Circuit said no.  *Id.* at 1376-77.  The court did, however, state, "The most relevant inquiry in that respect [royalty on acquisition price] would seem to be the amount of the business's value that is attributable to the patent infringement."  *Id.* at  1376.

*Transclean* comes nowhere near the issue whether an acquisition price may be relevant to an unjust enrichment analysis.

market share in critical early stages of web conferencing market growth.  That share increase is directly manifested in a larger revenue and profit streams than PW would otherwise achieve.  *See* Leitzinger Report ¶¶ 7-12, 14-56.  Thus, PlaceWare's enrichment from its misconduct is the value of the resulting share increase.  *Id.* ¶¶ 57-64.

The reasonable way to measure this increased value is as a portion of the total value of PlaceWare.  And the best evidence of PlaceWare's value – and so the value of its actual expected profit stream – is the economics of an actual arm's-length market transaction, Microsoft's post-misappropriation acquisition of PlaceWare's equity interests.  Those acquisition economics include (a) Microsoft's actual payment of $202 million for the equity interests in PlaceWare, as well as (b) Microsoft's recognition of $247 million fair market value for the PW enterprise [14], (c) Microsoft's conclusion that PlaceWare's equity interests had a stand-alone DCF of $250-$350 million [15], and (d) Microsoft's conclusion that the DCF of the buy-PlaceWare case exceeded the DCF of the build-at-Microsoft case by $340-$595 million. [16]  *See* Leitzinger Report ¶¶ 57-64; Leitzinger Decl. ¶¶ 25-28.

PlaceWare says all this is irrelevant and speculative.  But that is because it cannot explain away the fact that Microsoft actually paid $202 million for all of PlaceWare's equity.  That

---

[14]	*See* Exhibit O (Microsoft's Form 10-K for year ended June 30, 2003), at note 18 to financial statements ($247 million assets, $202 million in equity, $45 million in liabilities).  Microsoft used the purchase method to account for the PlaceWare acquisition, meaning all assets and liabilities of PlaceWare were revalued to market value.

[15]	*See* Exhibit N (slide deck from  Microsoft's "Final Approval Meeting – Project Turtle – 17 January 2003") at page 8, referencing "stand-alone DCF values of $250m-$375m.".  "Turtle" was Microsoft's code name for PlaceWare.  The purpose of the final approval meeting was to get final approval from Messrs. Gates, Ballmer, et al.

[16]	*See* Exhibit N at page 8.  As used in the "final approval" deck, "Value of Buy Case" is the value of PlaceWare after acquisition by Microsoft ($615m to $1,145m, net of $200m acquisition cost).

"Value of Build Case" is the value of a web conferencing business if Microsoft built its own ($275m to $550m).  "Buy Value less Build Value" ($340m to $595m) is the amount by which the buy-PlaceWare value exceeds the build-at-Microsoft value, even after paying $200m for PlaceWare's equity.

demonstrates Microsoft's undeniable confidence in PlaceWare's profit stream.  Indeed, we know from Microsoft's analyses that this purchase price was a low measure of value.[17]

Despite PlaceWare's protests,[18] the *Children's Broadcasting* case is instructive here. *Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir.2001), *on remand*, 2002 WL 1858759 (D.Minn.2002), *appeal after remand*, 357 F.3d 860 (8th Cir.2004).  In that case, after CBC started a children's radio network it contracted with ABC for advertising, terminable at will, with the parties signing a confidentiality provision but not forbidding ABC to compete.  Disney then bought ABC, and ABC started Disney Radio in competition with CBC. CBC sued, alleging breach of ABC's confidentiality provision and misappropriation of CBC's trade secrets.

After a remand for retrial on damages [19], the jury awarded damages based on a DCF valuation of ABC's accelerated entry into the market. [20]  The Eighth Circuit affirmed, holding

---

[17]    With regard to the conservatism of the transaction price, consider (i) Microsoft paid much less than its analyses showed PlaceWare was worth, even on a stand-alone basis (ii) Microsoft's analyses used discount rates that were high, (iii) all of the analyses consider after-tax profit streams, whereas a trade secret plaintiff is entitled to recover pre-tax unjust enrichment, and (iv) this ignores the $10-$15 million that the acquisition agreement obligated Microsoft to pay in employee bonuses.

[18]    PlaceWare salutes *Children's Broadcasting* as involving "an *accepted* academic methodology," but complains that it nowhere mentions "enterprise value." (Motion, at 11 n.7.)

[19]    At the first *Children's Broadcasting* trial, the jury verdict favored CBC, with damages based on *the injury to CBC's own business*.  The trial judge agreed that ABC breached its contract and misappropriated trade secrets; but he granted judgment for ABC as a matter of law, concluding that CBC had not presented credible evidence of damages and causation.

The Eighth Circuit reversed.  It affirmed liability for breach of contract and misappropriation, 245 F.3d at 1015, and it also held that there was evidence of causation and damage to CBC.  *E.g.*, *id.* at 1015-16 (discussing evidence that ABC undermined CBC's "first mover" advantage and accelerated its own market entry).  But the court affirmed the trial judge's ruling that the testimony of damages expert Willis had tainted the trial, since his analysis was based on the false assumption that ABC could neither terminate the contract nor compete with CBC.  *Id.* at 1018-19.

The Eighth Circuit remanded for a new trial on damages, where CBC won damages based on *the gain to ABC*.

[20]    *See* 2002 WL 1858759, *3 ("Children's presented evidence that ABC Radio and Disney were able 'to accelerate their entry into the market by using information, particularly information about advertising and marketing, they obtained from Children's.' … The damages jury approximated the value of that accelerated gain to Defendants").

---

that ABC was unjustly enriched by the difference between "Radio Disney's present value had ABC Radio and Disney not misappropriated or breached the confidentiality agreement" and "Radio Disney's value due to its misappropriation and breach of the confidentiality agreement":

> At the retrial on damages, Children's presented evidence ABC Radio and Disney had "accelerated" their entry into the children's radio market. …
>
> Dr. Putnam [a damages expert] offered a theory regarding ABC Radio's and Disney's accelerated entry into children's radio. …
>
> Evidence was presented that ABC Radio and Disney accelerated their entry into the market by using information contained in PX217. …
>
> … The discounted cash flow model Dr. Putnam presented allowed the jury to calculate the net current value of damages rather than damages likely to occur in the future. Dr. Putnam used the discounted cash flow method to determine the extent to which ABC Radio and Disney had been unjustly enriched. Dr. Putnam projected two revenue streams. One revenue stream was the future cash flows Radio Disney would have received if it had not misappropriated [CCBC's] materials or breached the confidentiality agreement. The second revenue stream was Radio Disney's future cash flows with the benefit of the material Radio Disney misappropriated and used in violation of the confidentiality agreement. Dr. Putnam discounted both revenue streams to arrive at Radio Disney's present value had ABC Radio and Disney not misappropriated or breached the confidentiality agreement as well as Radio Disney's value due to its misappropriation and breach of the confidentiality agreement. The difference between the two values allegedly constitutes the amount ABC Radio and Disney were unjustly enriched.
>
> … [T]he jury was properly instructed, and Dr. Putnam used future earnings to determine the current (as of October 24, 1996 [termination of ABC-CBC agreement] value of the loss caused by the wrongful acts of ABC Radio and Disney.

357 F.3d at 863, 864, 866, 869. In this case, Pixion asks for an award equal to the net current value of increased PlaceWare profits due to its misappropriation. *Children's Broadcasting* illustrates the appropriateness of Pixion's request.

## B.    The damages period extends beyond the liability period.

PlaceWare suggests another argument about Pixion's unjust enrichment calculation. PlaceWare complains that the damages period extends beyond January 29, 2002. "None of this analysis has anything to do with any unjust enrichment relating to Pixion's claimed trade secrets

because they stopped being secret as of January 29, 2002 [publication of '313 patent]."  (Motion, at 9.)  Moreover, "Microsoft knew that PlaceWare had performed a clean room redesign of the accused LiveDemo code … [and so] LiveDemo did not figure into Microsoft's calculus of future sales."  (Motion, at 10.)

The unremarkable answer is that the damages period properly extends beyond the liability period, because damages from PlaceWare's pre-January 2002 misconduct continue to occur after January 2002.  That is, PlaceWare's gains from its pre-2002 boost in market share show up both by increasing its current enterprise value (to $247 million) and in correspondingly higher profits going forward.  The value reflected in the Microsoft acquisition price is due, in part, to the market position that PlaceWare has gained from LiveDemo and the Pixion technology it contained.  *See* Leitzinger Report ¶¶ 49-64.

PlaceWare wants to end the damages period in 2002, because it incurred operating losses before that time.  Indeed, in spite of the high valuation shown by Microsoft's purchase price, PlaceWare plans to incur operating losses until 2005 or 2006.  But after that, it will experience substantial profitability, as its revenues pass its fixed expenses.  All of this is planned and expected, and it was explicitly considered in the economics underlying the acquisition by Microsoft.  This is typical of high-tech businesses where many legitimately valuable companies follow the strategy of building up market share before reaping the resulting profits.  *See* Leitzinger Report ¶¶ 32-37, 58-61. [21]

PlaceWare's misappropriation has made a substantial contribution to its prosperity.  But in PlaceWare's view, a prosperous misappropriator faces no greater damages than one who fails and goes out of business – so long as its ill-gotten gain occurs after the liability period.  Not surprisingly, PlaceWare has offered no support for that extraordinary proposition.

---

[21]    To stress the obvious:  PlaceWare is a living example.  Microsoft in fact paid $202 for PlaceWare's equity, and its sophisticated DCF analyses showed that PlaceWare was worth even more.  Microsoft took into account that profits would not appear for several years (*e.g.*, by using steep discount rates to discount future profit flows).

C.     **The calculation of unjust enrichment damages
       is not "overly simplistic and speculative."**

PlaceWare asserts that Dr. Leitzinger's calculation is "simplistic and unprecedented," so that admitting it would be reversible error.  For support, PlaceWare cites cases where experts sponsored truly bone-headed theories, with no support in reality. [22]  PlaceWare attempts no explanation why the fact-specific rulings in those cases somehow justify its assertion that Dr. Leitzinger's careful, thorough analysis must be excluded in this case.

Pixion would note, in this regard, that analyzing the effect of misconduct by looking to changed market shares is neither simplistic nor unprecedented.  *See, e.g.,* Model Patent Jury Instructions for the Northern District of California (2004) no. 5.3a. [23]

---

[22]     In *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir.1992), Judge Posner used blunt language in affirming a modest damages award after a bench trial in a family dispute.  Nephew was head of catalog sales at uncle's firm Schiller.  Nephew left to start competitor Nordisco, taking a customer list and leaving cousin to run Schiller.  Schiller sued for the entire drop in its own revenues.  Judge Posner suggested Schiller's claim was "childish," since (a) 95% of the list was a compilation sold by manufacturers, (b) cousin was both inexperienced and colorblind, and (c) the addition of a competing catalog would naturally reduce Schiller's revenues.

In *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 459-62 (D.N.J.1998), plaintiff LCC was a Sara Lee hosiery distributor in Lithuania.  LCC claimed that Sara Lee's gifts of pantyhose to relief organizations had ended up flooding Lithuania with black-market hosiery, and that Sara Lee had ineptly tried to cure the problem by giving LCC defective L'eggs hosiery.  In estimating LCC's lost business, LCC's expert assumed that (i) LCC would be a Sara Lee distributor for 20 years, (ii) LCC had a 10% regional market share, (iii) LCC's Lithuanian share would grow at 1% per year, and (iii) Baltic women consume 10 pair of pantyhose per year.  Excluding the expert's testimony, the court explained that (i) the 20-year projection was based on one witness's testimony that a Panamanian distributor lasted 24 years, (ii) the 10% figure was based on Western markets, (iii) the 1% figure had literally no basis, and (iv) the consumption estimate was based on a survey of American women, not Baltic women.  *Id., citing* 177 F.R.D. 245, 258 (D.N.J.1998).

In *KW Plastics v. United States Can Co.*, 131 F.Supp.2d 1289, 1292-95 (M.D.Ala.2001), US Can's financial officer offered testimony as to US Can's lost profits and KW's unjust enrichment.  The lost profits testimony was based in great part on his subjective say-so, with no attempt to tie his assumptions to the evidence; so his conclusion "is connected to existing data only by *ipse dixit*."  Similarly, on unjust enrichment, he assumed the KW contract with stolen customer Behr extended 10 years, but "has never reflected upon [any alternative] – not even long enough to reject it out of hand"; and he assumed without any thought that all of KW's gains were unjust enrichment.  That is, he "fail[ed] to give more than fleeting thought" to basic factors.  *Id.* at 1295.

[23]     Instruction 5.3a provides, "One way [patent holder] may prove the number of sales it would have made if the infringement had not happened is to prove its share of the relevant market excluding infringing products.  You may award [patent holder] a share of profits equal to that market share.  In deciding [patent holder]'s market share, you must decide which products are in [patent holder]'s market" (citing cases).

… (Footnote continued on next page) …

### D.     Trade secret damages are not limited
###        to PlaceWare's "cost savings."

PlaceWare sponsors a deliberately exculpatory " 'cost savings' theory of unjust enrichment," measuring unjust enrichment by "savings … the defendant enjoyed by not having to independently develop the misappropriated trade secrets." (Motion, at 12.)  It would cap damages at the "mere $2 million" it says it spent to replace LiveDemo (in 2003).  (*Id.* at 13.)

Pixion submits that PlaceWare is wrong.  The misappropriator's cost savings can be a relevant measure, but only where the trade secret owner has no losses and the misappropriator has no gain.  PlaceWare is trying to turn a *floor* of cost savings into a *ceiling*.

How do "cost savings" fit into trade secrets damages?  As the UTSA confirms, there are three basic approaches. [24]  One is to measure the plaintiff's losses.  The second is to measure the defendant's gain (unjust enrichment).  The third is to estimate the reasonable royalty that the defendant should have paid the plaintiff.  The third approach is a cost savings concept – *i.e.*, costs saved by using the trade secrets without paying a royalty.  One might sometimes group these concepts for purposes of discussion, [25] but at bottom they are different.

"Cost savings" are directly related to a "reasonable royalty."  Indeed, a reasonable royalty *is* the typical measure of the costs saved by misappropriation.  Thus, in considering the hypothetical royalty negotiation, PlaceWare might argue that the negotiators would have taken

---

*See also, e.g., Lepage's Inc. v. 3M*, 324 F.3d 141, 164-66 (3d Cir.2003) (en banc) (endorsing expert presentation of damages based on "lost market share" model), *cert. denied*, 124 S.Ct. 2932 (2004);  *Conwood Co., v. United States Tobacco Co.*, 290 F.3d 768, 791-795 (6th Cir. 2002), *cert. denied*, 537 U.S. 1148 (2003);  *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-61 (5th Cir. 2002) (permitting testimony despite arguments over market definition).

[24]     *See* Cal.Civ.Code § 3426.3 ("(a) A complainant may recover damages for the *actual loss* caused by misappropriation.  A complainant also may recover for the *unjust enrichment* caused by misappropriation that is not taken into account in computing damages for actual loss.  (b) If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a *reasonable royalty* …") (italics added).

[25]     For example, the reasonable royalty should have been paid to the plaintiff; so one could picture the reasonable royalty as part of the plaintiff's loss.  Or since the defendant benefits by not paying the royalty, one could picture the reasonable royalty as part of the defendant's unjust enrichment.

into account the cost to PlaceWare of any suitable, available alternatives to the trade secret.  And sure enough, PlaceWare's damages expert Paul Meyer states that the *reasonable royalty* is capped at $2 million, at least assuming that PlaceWare at the time had actual access to suitable alternatives for $2 million.[26]  (One of PlaceWare's problems is that no suitable alternatives were in fact available to PlaceWare.)

But PlaceWare may not cap *unjust enrichment* damages at $2 million in "cost savings," where PlaceWare is in fact $72 million better off by having misappropriated Pixion's trade secrets.  The law does not support that approach.  And as a practical matter, it would totally eliminate PlaceWare's incentive to avoid misappropriating Pixion's trade secrets – why not gamble and try misappropriation, if the only penalty is no more than what might have been due initially?

PlaceWare cites four trade secrets cases, which provide **zero** support for capping unjust enrichment at PlaceWare's supposed cost savings.  *See Sokol Crystal Products, Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1433 (7th Cir.1994) (Wisconsin law; affirming instruction the jury could award defendant's cost savings *in addition to* plaintiff's damages)[27] ; *Litton Systems, Inc. v. Ssangyong Cement Industrial Co.*, 107 F.3d 30 (Fed. Cir.1997) (table), *unpublished decision at* 1997 WL 59360, **8 (California law; disapproving district court's calculation of unjust enrichment as present-valued *ex ante* profit stream as of time of

---

[26]     Mr. Meyer expressly relies on *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir.1974).  In its lengthy discussion of reasonable royalties, that decision explains that the "standard of comparison" measure – which PlaceWare recognizes as another label for its "cost savings" theory – is a variation on the "reasonable royalty" theme.  *Id.* at 538 ("One other important variation on this 'reasonable royalty' standard is the standard of comparison method").

[27]     The instruction told the jury "that it could 'award plaintiff the cost that defendant would have incurred in acquiring the trade secrets through its own experiments or lawful means to the extent that you have not previously taken that cost into account in determining plaintiff's damages.' "  15 F.3d at 1433.  The court proceeded to affirm an award based on plaintiff's lost profits, calculated as the present value of its past and future sales.  *Id.* at 1433-34.

infringement, as opposed to using actual post-infringement profit stream) [28] ; *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 908 F.2d 706, 714 (11th Cir.1990) (Georgia law; awarding cost savings; district court's unjust enrichment award could include *larger* of defendant's profits and defendant's forgone costs, but not both) [29] ; *Sonoco Products Co. v.*

---

[28]     In *Litton*, District Judge Vaughn Walker observed, "The case law demonstrates what the language of the Uniform Trade Secrets Act suggests: courts have considerable leeway in calculating a damage award for trade secrets theft." 1993 WL 317266, *2 (N.D.Cal. 1993). He then decided that plaintiff Litton was "entitled to the greater of its own loss or defendants' expected gain," *id.* at *4, calculating the defendants' expected gain from an ex ante perspective rather than ex post. *Id.* at *3. That is, he based damages upon "the present-valued profit stream anticipated by defendants at the time of the theft of trade secrets." 1995 WL 481458, *1 (N.D.Cal. 1995).

In its unpublished decision, the Federal Circuit chose the ex post approach, saying it was error to use expected gains that were not in fact realized. In the process, it stated,

> The correct approach under California law is to evaluate the evidence of the plaintiff's actual loss and the defendant's unjust enrichment caused by the misappropriation. If the plaintiff has failed to produce sufficient proof on either score, the court may look to evidence of a reasonable royalty. … [¶] *In cases of trade secret misappropriation, unjust enrichment is normally measured by the defendant's profits on sales attributable to the use of the trade secret.* See Restatement of Unfair Competition § 45 cmt. f (1995) … . The defendant's gain has also been measured by the cost saving that the defendant has realized from using the trade secret. See also Salsbury Labs., Inc. v. Merieux Labs., Inc., 908 F.2d 706, 7114 (11th Cir.1990).

1997 WL 59360, **8 (italics added).

[29]     In *Salsbury*, the district court decided to award unjust enrichment damages based on the defendants' gain:

> [T]he damages in this case should be measured by "the benefits, profits, or advantages gained by the Defendants in the use of the trade secret." Univ. Computing [v. Lykes-Youngstown Corp.504 F.2d 518 (5th Cir.1974)] at 536. Indeed, as noted in Univ. Computing, measuring damages by the Defendants' gain is "the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove specific injury." Id.

735 F.Supp. 1555, 1578 (M.D. Ga.1989). It then awarded both $52,000 in defendants' profits, and $1 million in costs saved by defendants from using plaintiff's trade secrets. *Id.* at 1579.

The Eleventh Circuit disallowed the $52,000 award of defendants' profits, but left in place the $1 million in forgone costs. Giving both would be double-counting. 908 F.2d at 714-15. The court left in place the award of forgone costs, but only because that award was larger than the $52,000 profits. It definitely was *not* stating a preference for awarding the defendant's forgone costs rather than defendant's gains.

*Johnson*, 23 P.3d 1287, 1288-89 (Colo.App.2001) (Colorado law; affirming award of cost savings where *the plaintiff* asked for that measure). [30]

### E.    The unjust enrichment damages are not too big.

Pixion makes three arguments that boil down to a complaint that the unjust enrichment damages are too high for PlaceWare's taste.

First, PlaceWare complains that $72 million is higher than a reasonable royalty.  (Motion, at 14.)  A general response is that unjust enrichment and reasonable royalty are alternative measures of damages.  Why should they be equal?  A specific response is that PlaceWare's royalty calculation is low because it stops in January 2002.

Second, PlaceWare complains that PlaceWare's enterprise value in January 2003 is less than Pixion's enterprise value in 1997 (which PlaceWare calculates by grossing up the purchase price for 51% of Pixion's stock).  (Motion, at 14.)  PlaceWare's point is not clear.  If the comparison is supposed to undermine the $247 million figure, it fails; that number comes from a real-world transaction.  If the point is that PlaceWare was more valuable than Pixion, then we agree.  But neither point undermines Pixion's right to recover full damages.

Third, PlaceWare complains that "even if evidence of PlaceWare's $247 million purchase price were relevant …, it should be excluded under Rule 403 as far more prejudicial than probative."  (Motion, at 15.)  But Rule 403 is not a vehicle for preventing a plaintiff from proving damages and explaining why it is entitled to recover them.

---

[30]    In *Sonoco*, the plaintiffs asked for an injunction and $4.6 million (costs savings *plus* "royalty damages for plaintiff's lost business").  The Colorado court of appeals affirmed the injunction and the $4.6 million.  23 P.3d at 1289-90.

### F.    Dr. Leitzinger's enrichment analysis also applies to Pixion's contract claim.

PlaceWare's motion discusses only Pixion's trade secrets claim, and so Pixion's response has been geared to that claim.

However, Pixion also has a contract claim, based on PlaceWare's use of Pixion's information in violation of the 1997 L&D Agreement.  Dr. Leitzinger's enrichment analysis also applies to the contract claim.  That is because Pixion is entitled to disgorgement of PlaceWare's gain as  remedy for PlaceWare's breach of its negative covenant. [31]

For the reasons set forth above, Pixion firmly believes that the Court should DENY PlaceWare's motion in all respects.

Dated:  January 18, 2005                          HOSIE, FROST, LARGE & McARTHUR
                                                                  CARR & FERRELL LLP


                                                         By ____/s/ Spencer Hosie_____
                                                         .         Spencer Hosie

                                                         Attorneys for Plaintiff Pixion, Inc.

---

[31]    *See Landsberg v. Scrabble Crossword Game Players, Inc.*, 802 F.2d 1193 (9th Cir. 1986) (awarding defendant's profits in suit under California law for breaching agreement not to publish transcript shared in confidence);  Restatement (Third) of Restitution and Unjust Enrichment (Council Draft 6, 11/12/04) § 39 (profitable and opportunistic breach of contract requires defaulting promisor to disgorge "the profit realized as a result of the breach," including "consequential gains that the defaulting promisor would not have realized but for the breach"); *id.* at Illustrations 3 and 4.

*See also Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir.2001), *on remand*, 2002 WL 1858759 (D.Minn.2002), *appeal after remand*, 357 F.3d 860 (8th Cir.2004) (breach of contract and trade secret misappropriation; head-start damages measured by difference between present value of defendant's actual expected profit stream, less present value of but-for profit stream);  *Snepp v. United States*, 444 U.S. 507 (1980) (CIA agent who fails to pre-clear book as per agreement must disgorge profits).